Good morning, Your Honors. Laura Weitzma on behalf of Marilyn Monroe LLC. I will be addressing those issues unrelated to the Indiana statute, which will be addressed by Mr. Ted Minch. We've decided to divide the time. I will take the first 12 minutes to address the issues other than the Indiana statute, and we'd like to reserve four minutes for rebuttal. Okay. Please watch your clocks. This appeal is not about whether my client should ultimately prevail on the merits of its claim, but about whether it was stripped of its right to a jury trial to decide that issue because of a position taken by a third party in a prior administrative proceeding of which it had no notice and no opportunity to be heard. A position taken based on incomplete information by the executor of the Marilyn Monroe estate, an individual that was necessarily in conflict with the beneficiaries of the estate. All right. Let's start with what was it that you think that Erin Frosch didn't know about Monroe's intent as to her domicile in the 1960s? To begin with, let me explain a little bit about the relationship between Marilyn Monroe and Erin Frosch. Erin Frosch was her divorce attorney who she hired in early 1961. In connection with her divorce from Arthur Miller, she executed a will, and Erin Frosch handled the divorce proceedings and also prepared the will for her. I don't think you just answered my question. I'm sorry. I mean, you answered the question you wanted to answer. You didn't answer my question. What he didn't know is what was going on in Marilyn Monroe's life at the time she died. He did not have contact with her in 1962. In fact, by the middle of 1962, Erin Frosch had been deemed a, quote, needless expense for Marilyn Monroe. And I'd like to point the court to the ex- Who are you quoting? This was in correspondence between Marilyn Monroe's secretary and communications with the new attorneys, I believe, the Mickey Rudin firm. But what happened was that Marilyn Monroe left in 1961, left New York and moved to California. So to answer your question directly, what Erin Frosch didn't know is what was happening in Marilyn Monroe's life in 1962, and specifically in August of 1962. What he also didn't know and what we ultimately learned was information about what was going on in her life through the over 12,000 pages of documents that were uncovered during the course of this litigation. At the time of Marilyn Monroe's death, her manager, Inez Melson, had sequestered a significant collection of Marilyn Monroe's possessions and documents. And they were sequestered until four years ago when I had the opportunity, along with Lee Strasberg's son, to recover those documents. And many of those documents, the majority of those documents, were documents from 1961 and 1962 that spoke directly to Marilyn Monroe's intent to remain in California. Documents such as receipts for the purchases she had made for her new home in Brentwood, California. So are you suggesting that Erin Frosch intentionally misled the tax authorities in 1962? Not at all, Your Honor. Our position is that based on the limited information that he had, and based on his relationship with her in early January-February 1961, and his representation was very limited. In fact, in the excerpts of record of 574, it states Mr. Frosch stated that they had not been representing Ms. Monroe for any length of time. Based on the information he had... When you quote, would you give us the source? I mean, who said that? I apologize, Your Honor. Of the ten volumes, I pulled out this page. But this is correspondence... What are you quoting? This is correspondence to Mickey Rudin, who handled the California proceedings, both representing Marilyn Monroe during a lifetime, and then handled the ancillary proceedings here in California. And what happened is that given the limited amount of time he had with Marilyn during her life, and given the fact that he did not have access to the bulk of her correspondence, her professional records, her personal documents, in 1962, Erin Frosch made representations based on statements provided by people who knew her when she lived in New York. If you look at the affidavit submitted to the California tax proceedings, those are all individuals that were in New York and knew Marilyn Monroe from living in New York. But if you look at the documents themselves from 1961 and 1962 that Erin Frosch did not have access to, the receipts, the correspondence, her writing to Arthur Miller's father and Arthur Miller's children describing her new home, and inviting them to her new home, and documents describing the headquarters for Marilyn Monroe as Los Angeles, and describing, you know, the efforts that she went to landscape her home to put in new plumbing and electrical, all these documents were not available to Erin Frosch in the mid-1960s when he took the position that she was a non-resident of California. It was only four years ago that we were able to obtain these documents through a proceeding in Los Angeles Superior Court. So there does not need to be any intent to deceive when Erin Frosch took a position based on the limited information he had access to then. And what the court did is it decided that because there was an inconsistency between the position taken by Erin Frosch in the mid-1960s in submitting the affidavit resident, the residence affidavits, and the position taken by my client in the course of the proceedings below, it said that there necessarily had to be an intent to deceive on somebody's part because of the inconsistency. And we've cited case law, the Klein case in particular, that talks about you can't discern intent to deceive merely from the fact that an inconsistency exists. But the inconsistency that was, well, if there was an inconsistency, and there is an inconsistency between the positions, that when Frosch represented to the California courts, and the California courts accepted that her domicile was California, it was with the idea, I mean, it was New York, it was with the idea that there was some tax advantage to her. Now, that may have later turned out not to be true, but it was for the purpose of getting some tax advantage for her estate. Isn't that correct? Your Honor, yes, there was an inconsistency between the positions taken, and yes, Mr. Frosch took the position that she was a non-resident of California in seeking to obtain a certificate, a no-tax certificate from the California tax authorities. Ultimately, he was not successful in obtaining that no-tax certificate. The California assessor did impose $777 in taxes, but in reaching the finding that Marilyn Monroe was not a resident of California, ultimately the estate ended up being doubly taxed on the percentage payments relating to her. Right, but at the time when Aaron Frosch made those representations on behalf of the state, he did not know that was going to happen, correct? I can't assume what he knew, but that's part of the case. Oh, you're telling us a lot about what he knew and didn't know. Well, certainly at that point in time, there had not arisen a dispute as to whether the estate was going to be taxed in New York, and there was lengthy litigation over whether he should have been aware that he would be doubly taxed for paying both in New York and in California. But one of the things to bear in mind is that there is no evidence that the estate actually obtained a benefit by virtue of paying those taxes in California as opposed to New York. There was no evidence presented that there was a lower tax rate in California and a higher tax rate in New York. This was not a situation where somebody was trying to get out of paying taxes. The taxes were paid, and it's in the record, the taxes were paid on the income in New York. And so there was no evidence that somehow paying taxes in New York instead of California provided the estate an unfair benefit. Can I just ask you a little bit more about intentional misrepresentation, although I would like to ask you more about privity? Sure. Hopefully you'll get to that at some particular point, but I read through Judge O'Connor's opinion, the 64-page opinion. I didn't see any representation that she made a particular finding that one person or another made an intentional misrepresentation. I think that's the law required by the Ninth Circuit. There has to be a showing of intentional misrepresentation. You read it. You read that opinion to suggest that, well, because of the inconsistency between the positions of, you know, in New York, advocating for New York, then California, someone must have been intentionally lying. Is that how you read what she did? Well, yes, there is an intent requirement in the Ninth Circuit, and the issue of intent was addressed in footnote 91 of Judge Marra's opinion. And in the Court's decision at footnote 91, it made a finding that it is clear that Frosch intentionally advanced the position that Monroe was domiciled in New York at the time of her death. Yes, he intentionally advanced that position, but that is not equivalent to a finding of intent to deceive. And we agree that there was never any finding as to an intent to deceive, either on Mr. Frosch's part or on the part of my client. The Court, in that same footnote, said that the fact that we took such strong disagreement with the content of those affidavits suggested that they must be misleading or have intended to deceive. Well, it has to be to the degree, as I recall the Ninth Circuit case law, has to be to the degree of defrauding the Court, basically. There has to be a particular finding that someone had the intention of defrauding the Court by making a misrepresentation. No, the case law is to the effect of judicial estoppel is intended to remedy self-contradiction. It's intended to be an extreme remedy to impose under the most exceptional circumstances when the equivalent of a fraud has been perpetrated on the Court. I'm a little concerned about the statement. I don't know if the Ninth, to the extent the Ninth Circuit has an actual requirement of intent to defraud, whether it survives the Supreme Court decision in New Hampshire v. Nain, and whether or not that should be, I mean, there has to be some affirmative representation. But certainly the Supreme Court doesn't require an intentional misrepresentation. It says it requires where a party assumes a certain position in a legal proceeding and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him. So I have that question, but I think really what probably you really need to address is what Judge Sessions suggested you address, which is privity, because obviously Judge Morrow found it, and that's a serious issue here. And the one thing that you didn't necessarily address in detail is when you're talking about privity, you go beyond Anna Strasberg to MMLLC, which has perhaps a number of individuals as a part of that independent organization. And how does an independent organization in 2000-whatever establish privity with Frosch in 1962? That's an excellent question, one that we raised in our briefs both below and on the appeal, is that you don't have a situation where there's any allegation that our client, Marilyn Monroe LLC, which has two members, was in privity with the executive of the state. You have a situation where the members had privity with Lee Strasberg, Marilyn Monroe's acting coach, and Dr. Miriam Criss, her psychiatrist. And when those two individuals died during the probate proceedings that dragged on for almost 40 years, they passed their interest in the Monroe estate on to Anna Strasberg and the Anna Freud Center. And so what you have is a situation where you're twice removed. But on the issue of privity, the Supreme Court has made clear that an executor of a state or an administrator of a state owes obligations to the state, is an agent of the state, and an administrator or an executor owes obligations to creditors, to the state, and to the beneficiaries, and necessarily is a conflict in that relationship. And on the issue of whether somebody can be bound through a privity relationship, the Ninth Circuit has made clear in Cordes v. Cameron that no matter what the theory of privity is, that in order to have constitutionally adequate representation, that you can't have a situation where the party purported to be bound is in conflict with the representative. What is confusing to me is when the judge, I thought, took the relationship between an executor and a beneficiary and established that privity relationship per se. Or maybe she did it per se. I would think in a situation just a small will with only one beneficiary, you would think that there is a relationship, a privity there. But that doesn't necessarily apply when you've got hundreds of beneficiaries, all of whom may have conflicting interests. And so as a result, doesn't it become sort of a factual question as to whether privity exists between two given parties, one executor and one particular beneficiary? We argue that privity in this case, whatever the Court might decide, is a general proposition between executors and beneficiaries. But on the record of this case, that there clearly could be no privity given the adversity between the beneficiaries and Aaron Frosch. In fact, in 1980, Dr. Miriam Criss filed objections to the treatment of the proceedings to that point, and litigation ensued. In 1980? In 1980. Okay, but didn't Marilyn Monroe die in 1962? She died in 1962, and the proceedings wrapped up in 2001. Okay. I mean, that says something about the adequacy of representation. But in 1980, Dr. — Your Honor, I'm going way over your time. I'm way over my time. But the point was that here, where there was actually a conflict between the beneficiaries and the executor, such that it resulted in litigation and the executor having to pay over $100,000 out of his own pocket to resolve that dispute between himself and the beneficiaries, then as a matter of fact, you could not have privity in the circumstances of this case. Okay. So who is the best person among you to answer the very fundamental problem that I have with this entire case, which is, how could Marilyn Monroe have passed a right of publicity onto her heirs that didn't exist until the 1990s, and only in a couple states? Your Honor, there was a right of publicity that existed at the time she died. Marilyn Monroe had a right of publicity that was recognized by California. In 1962? In fact, the right of privacy was recognized. Privacy. We're talking about your arguing for the right of publicity. Publicity. I understand. It was described in the earlier cases as a right of privacy. When was the statute enacted that created the right of publicity in California? 1971. It was statutorily recognized and specifically indicated that it was supplemental to any rights recognized at common law. But the whole premise of your case is that she passed onto beneficiaries a right that she didn't even know she had and didn't actually have, or maybe never had. And now we're getting into the whole business of the retroactivity of... Then you have the California legislature in 2007 pass that law, which says you go back 70 years from... I just don't see how she can pass on a right to something, a property right, where that property is not recognized at the time. It was recognized as a matter of common law. It was statutorily recognized in 1971. In 1984... Okay, but now you're talking about California, because it wasn't recognized at all in New York. Not after death, although that took a long time. No, it wasn't recognized at all in New York. It's still not recognized in New York, is it? It is during somebody's lifetime, pursuant to a statute in 1902. Okay. During the lifetime, but not after they died. That's correct. That's why we're here today. Okay. Thank you. Thank you. There's a minute 38 left. Good morning. Theodore Minch on behalf of CMG Worldwide. I'll speak very briefly, and I'll try and take only a minute to do that. I'm here representing CMG Worldwide to discuss the... and I think it dovetails into your concerns with regard to the statute and perhaps passing a right that did not exist. It's our position that, as Ms. Weitzman had alluded to, that right did exist. We believe that there's a... there's some courts that have found that during lifetime, what we're talking about is a right to privacy. We don't believe that that's what we're talking about in death. Certainly, one has a right to contract for the use of... for others to use their name and likeness during their lifetime. There should be no reason why that right wouldn't carry forward past death. And so we believe that this is a right, Your Honor, or Your Honors, that has always existed. And that's the crux of our argument as to the Indiana statute. Thank you. Thank you. Good morning, Your Honor. Serge Soni on behalf of the attorneys. Let me address, if I may, the questions raised by the court. The Honor asked appellants, what is it that Mr. Frosch did not know at the time of Marilyn Monroe's passing that led him to the assertion that she died a New York domicile as opposed to a California domicile? And her response was, gee, she didn't know about what Marilyn was doing in the last couple of years of her death. Those facts were best known to Mr. Rudin, who was her counsel here, and who had stated that Mr. Frosch was an unnecessary expense. What's missing from that statement, Your Honor, is the fact that Mr. Rudin assisted Mr. Frosch in connection with the entire probate estate. He represented Mr. Frosch in the California ancillary probate. He prepared the request for the California ancillary probate. He is the one that wrote into that request the statement of domicile, clearly expressing that Marilyn intended to maintain her New York residency and not her California residency. Did Mr. Rudin prepare the affidavit concerning residence? Yes. In the record? Yes. It appears at 474. Actually, it appears two or three times within the record. But it explicitly says within that document, prepared by Mr. Rudin, submitted to Mr. Frosch by Mr. Rudin for his execution, submitted to the court by Mr. Rudin as local counsel, and Mr. Rudin also prepared all the other affidavits that Mr. Frosch relied on in the California tax proceedings. What did Mr. Frosch not know that Mr. Rudin knew? Mr. Frosch knew everything that Mr. Rudin knew. He was his local counsel. There is, in fact, a petition for final accounting, not final accounting, but for payment of extraordinary fees incurred in connection with the ancillary proceedings in which Mr. Rudin submits that he had assisted Mr. Frosch for 14 years during the entirety of the probate at that time, that he had investigated the question of domicile, he had prepared the declarations and affidavits, he had assisted in formulation of all of those, and that the benefit that all of this work achieved was the entire Marilyn Monroe estate as contract rights, which were very substantial, were not taxed in California. Only her percentage incomes were taxed rather than the aggregation and valuation of the entire contract rights. That was the objective they sought to achieve by claiming that she was a New York domicile. They went to great lengths to achieve that. They achieved that result. The Ninth Circuit does not require intentional misrepresentation. It does require intentional conduct. There is intentional conduct, and that's consistent with the New Hampshire case and the Supreme Court's dictates, which again says the conduct, the representations, the positions taken must not merely be accidental or incidental, they must be intentional. Well, I'm just looking at the Wyler-Summit case, and in quote, the party's position, in quote, is tantamount to a knowing misrepresentation or even a fraud upon the court. Um, close quote. That's more than just an intentional act. That is a, that calls for a deliberate misrepresentation to a court, which is the equivalent of fraud on a court. That seems to be what the court said. Now, how we use that is, I guess, that's more or less raised another question, but That's certainly so. The Supreme Court, of course, does speak to the topic, and it talks of intentional conduct as opposed to intentional misrepresentation. But what we, what I think is ultimately important is which of the statements must have been fraudulent? The first or the second? I bet you're arguing the first. Are you? I am. I believe that at the time, I'm sorry, I believe that at the time that Mr. Frost made the first statements, he thought they were true. And he believed them to be true. And they investigated and believed them to be true today. I believe today, MMLC finds value in arguing that that was an incorrect statement, it was a mistaken statement, and that the true statement is that she was a California domicile. It isn't. It shouldn't be treated as such. And they do it to achieve a benefit today that back in 1962, they didn't know they needed or wanted, namely, the right of publicity that came into effect pursuant to California statute. It could be both. I mean, there's this letter in the record that dated April 24, I think this is from Rudin to Frosch, where he states with respect to the affidavit concerning residents, you must furnish us with some information to counteract the fact that Ms. Monroe owned a home and actually was living in California at the time of her death, and that her mother is physically in California. You will see the types of questions that are asked. It is important that you answer all of the questions, and in doing so, build as strong a case as possible. So, from that, I mean, you would draw an inference that perhaps there was some case that was being made for some advantage that may or may not be true. Or, and that today, the, I guess, the Marilyn Monroe LLC is intentionally representing that, or is representing that it's California to get the benefit of this special legislation that Representative Kuehl enacted for them. Or, it could be that no one really knows that everybody's arguing to, you know, the facts to their advantage at the time. And I sense that that's what Judge Morrow was reacting to when she found judicial estoppel. I think what's clear is that at the very least, I think we all have to acknowledge that the statements made by Mr. Frosch back in 62 were statements that were intentionally made. They were not accidentally made. They were not incidentally made. They were not by way of passing. They were specific. They were directed. They were intended. And they were intended to persuade the tribunal to accept his position that she was a non-resident. The tribunal, in fact, accepted that position. They achieved their objective. They established that position. Can I ask you about privity, your analysis in regard to privity? Because you have to establish privity in the judiciary. And Mr. Frosch, the executive of the state, do you believe that whenever you have an executor or administrator and a beneficiary, that there is a privity relationship, generally speaking? I think generally speaking, there is a privity relationship, because by virtue of the office of the executor, they're a fiduciary. They post a fiduciary's bond. They have to be relieved of that. But you would acknowledge that there are going to be inconsistent positions between an executor of an estate and one or more of the beneficiaries. As a general matter, would you not? Without a doubt. One or more of the beneficiaries may want something different than what they may be legally entitled to do. Well, then how, if that's the case, then how can there be a privity relationship between the executor and the beneficiary when, in fact, their interests conflict? They don't necessarily conflict. They conflict only if a beneficiary seeks something that they're not otherwise legally and appropriately entitled to. And in those cases in which there is that conflict between the beneficiary and the executor, isn't it a matter of factual interpretation as to whether or not privity relationship exists? I think, Your Honor, that we cannot conflate the concept of privity with agency. Without a doubt, an agent is duty bound to fulfill the master's desires. However, one in privity simply is one who shares the substantial legal relationship and does not necessarily have to fulfill each and every wish of that person that they're in privity with. By function of his office as executor, by the duties imposed pursuant to law, there is a duty of honest dealing with the court, with the creditors, and with the beneficiaries to apply and interpret the will or the trust, the testamentary document, and to give to each their due, not to favor one over the other. I don't believe that that duty of honest dealing creates a conflict. I believe that that duty of honest dealing imposes a duty to ensure that that beneficiary receives all that they are due, not more than they are due. I mean, you might I guess the district court said that for purposes of the domicile issue, their interests were all aligned because by having the domicile be in New York, the estate had to pay the estate taxes, not the individual beneficiaries. So for purposes of that issue, their interests would be aligned. Well, there were a whole host of benefits that were achieved by claiming her as a New York domicile. The beneficiaries didn't pay taxes. The estate didn't pay taxes on the California contract rights. If she had been a domicile of California, the benefits were raised, assessed, and taxed. But you would acknowledge that MMLLC was not even involved until fairly recently, and that as soon as they became involved, their interest essentially would be consistent with the domicile being located in California because then they would have the right of publicity. So it's fair to say that their interests conflicted with the interests of other beneficiaries who may be benefited by domicile being located in New York. MMLLC takes no greater right of interest than that of its predecessors in interest. The fact that it today has a financial interest and a desire to establish California domicile so that they can enjoy this right of publicity they could not otherwise enjoy does not give them broader rights than what their predecessor in interest had. Their predecessors in interest are Lee Strasberg and Marianne Criss. The owners, the principals, the members of MMLLC are only the heirs of Lee Strasberg, Anna Strasberg, and the heir, the legal heir, of Marianne Criss, the Anna Freud Foundation. Just as in a property dispute, after the sale, if a property boundary is established by a predecessor, you don't get to go back and revisit it. It's really confusing to me as to what exactly MMLLC's position is. In fact, they were not heirs. They were a it is an organization which is created by various individuals to administer these particular photographs and they're not direct descendants of the Strasbergs or Criss or anyone. They're basically a creation of various people creating an organization. That's not correct. They are a creation of only Anna Strasberg and the Anna Freud Foundation who are direct legatees of the rights of Lee Strasberg and Marianne Criss who are the beneficiaries under the Marilyn Monroe will. Consequently, there is a line of direct succession that brings the interest back to MMLLC. As a consequence of that, they share the same substantive legal rights that the original beneficiaries did. And whatever relationship of privity, responsibility, legal relationship that existed between Mr. Frosch and the beneficiaries and the duties he owed to those beneficiaries as executor, passed through to Anna Freud. Passed through initially from Lee Strasberg down to Anna Freud, from Marianne Criss down to the Anna Freud Foundation and then from them by assignment to this LLC that they created that they are the only two members of. There's nobody else that is a member. This is not a third party entity that purchased the rights or took a license. These are direct passages of the interest and MMLLC cannot have a greater interest than what Anna Strasberg and the Anna Freud Foundation has and they cannot have a greater interest than Lee Strasberg and Marianne Criss did. And those interests were represented by Aaron Frosch in all of the work that he did. They had the opportunity, they had knowledge, they had participation, they received executor's reports, they objected to at least the Marianne Criss objected to the discharge of Mr. Frosch's fiduciary bond until they could resolve it because they viewed him as owing them a responsibility with respect to all of his conduct. That relationship existed. There is a direct relationship. The Supreme Court says in Taylor that if there is the same substantial legal relationship and there is here, you've satisfied the requirements to have non-party assertion of preclusion. Now realize Taylor was a claim preclusion case not a judicial estoppel case. But the doctrines are similar and the standards we all agree are the same. Inconsistent statements, clearly inconsistent statements, the prior position was accepted and if there is a change in position, there is a benefit or a detriment that results. Now we've got all of those mapped here. Frosch is acting in a representative capacity in all the work that he did when he made these statements. Strasburg and Criss had noticed because Frosch filed his executor's reports. Frosch vigorously represented the interests. Anna Strasburg succeeded Frosch as the administrator so she actually took his position. She had, while that probate was open, the ability to go and challenge, change, correct, do anything that she wants. She is the principal and the primary member of MMLLC today. MMLLC is the successor in interest. Frosch clearly took inconsistent positions. The positions were accepted and by the change of position now, there is a benefit that is going to be reaped. The suggestion that some new documents were discovered through the Inez Miltzen stash that was taken that bear upon domicile is discredited by the fact that MMLLC did not rely on any of those documents in support of its motion for reconsideration. It simply went forward on the original documents. This is a manufacture on appeal. This was not raised before the district court. It is not claimed that there are documents there that show a different result should be outcome. But... If there are, they weren't given to the district court? Correct. All right. Suppose we don't agree with the judicial estoppel argument. What is it right for us to look at the constitutionality of California SB 771? I think the court should. I think the court needs to. Clearly, what the district court did is having a whole range of opportunities to decide whether or not a claim was well stated by MMLLC so that the relief that it sought could be provided. It decided to rule on the question of whether MMLLC is judicially estopped from asserting California residency and domicile. Whatever the outcome of that, the other grounds are equally viable for supporting a decision that there is no claim here. I'm actually very concerned about the possible conflict between the California legislation and the Federal rights to copyright and trademark that are in the constitution. I'm not sure that was ever argued. We raised it. We raised it in the context of our concern that... You raised it in the preemption argument, the copyright preemption. Correct. I understand that to be the same argument. Okay. There's clearly a preemption provision within the copyright statute, the Federal copyright statute. What it means is no state can impose or legislate in that area to grant similar rights or to deprive an owner of copyright of the right to enjoy and exploit the copyright interest that's federally granted. The impact of the California right of publicity law is that even though a photographer has a photograph, all the individual that is a copyrighted photograph and has a Federal right to exploit that photograph by making derivatives, by licensing it, by using in connection with goods, they can't do it. They can't do it without paying the right of publicity owner for the right to use and without that consent, they can't exploit it at all. And that's the case now in California and Indiana. We have that clash. Is it anywhere else? Oh yeah, there are I think 13 or 14 states, I might be wrong, that have right of publicity statutes. There have not been a large number of cases. I think there may be only four cases that have attempted to examine the question of the interplay between a right of publicity law at the state level and the Federal copyright interest. And the cases seem to recognize the following tenets. Number one, an exercise of a copyright interest is not the same as the exercise of a right of publicity interest. The right of publicity is distinct and perhaps broader in some ways than the specific expression which is captured in a photograph painting or other means under the copyright statute. The exploitation of the photograph, and I'll use photograph here because it's the easiest to become a subset of the broader interest that a right of publicity supposedly protects. But by virtue of the Federal preemption provision, the broader right of publicity ought not trample the federally granted right to exploit the photograph. That's the conflict that nobody has quite resolved. That's sort of the merits of this underlying case, right? That's what got us here, frankly. That's exactly what brought us to court. CMG, as the licensing agent for MMLLC, threatened suit against all potential licensees of photographs of Mr. Green and Mr. Kelly saying, if you take a license and don't pay us, we'll sue you. And in order to put a halt to that chilling effect, Mr. Green said, if you continue this, we'll sue you. And then there was a race to the courthouse. MMLLC and CMG... You acted the same day, didn't you? One in Indiana and the other in New York? Correct. And in California, two or three days later. So we ended up fighting over where it should be litigated for a year and we finally ended up back here in California and in New York, in Indiana. New York has stayed at the appeals level till we decide this case. I'm sorry, I don't understand. New York is waiting for this panel's decision. Let me address real quick the issues raised by CMG with respect to the Indiana statute. I don't know if the Court has great concern about that, but that statute is troublesome for a number of reasons. It purports to extend substantive rights to non-Indiana citizens and it purports to do so retroactively and it purports to do so without concern for any conflicts that may arise from the rights that the domicile state of that person may extend or not extend. But that statute is also internally inconsistent because it says that if the personality, and that's the term that everybody uses for the deceased person, if the personality dies testate, then the domicile state controls what rights exist. But Indiana provides a remedy for infringements in Indiana. But if the domicile state then Indiana controls and extends the right of publicity and grants it to specified persons and allows a right of remedy for infringements in Indiana. That is so broad and such an interference with the rights and privileges that states have to govern their citizens and the federal interstate commerce interest that it is unconstitutional and should not be recognized. Moreover, it doesn't explicitly say it's retroactive, but CMG attempts to afford it retroactive application. If it isn't retroactive, then it's of no meaning with respect to Marilyn Monroe. It came into effect in 1994. Marilyn passed away in 1962. If it has no retroactive effect, it doesn't impact her. She died testate, where she was domiciled is why we are here. CMG just, Indiana simply doesn't have an interest with respect to this case. Finally, I'll just take one moment if I can. I want to address the issue of lapse. If, for argument's sake, the California statute creates a post-mortem right of publicity that actually does apply to Marilyn Monroe, even though she died in 1962, long before it was implemented in 1985 and then amended in 1991. Even if that right of publicity exists, the beneficiaries who were to receive that right, pursuant to the California law, Lee Strasberg and Marion Criss, deceased. They died prior to that statute first going into effect in 1985. One died in 1980, the other died in 1982. What happens to the interest that was pursuant to California statute if they are pre-deceased? That's a decision that's governed by New York law, because they were both New York residents, domiciles. And New York law provides it does not pass to their heirs. At the time of their death, they were not vested with an interest, and they had no expectation of an interest in a right of publicity in Marilyn Monroe passing to them through a residual reclause of her will. They did not know of such a right, they did not have such a right, they could not convey such a right, and their will could not convey such a right. Consequently, even if there is a right of publicity under California that applies to Marilyn Monroe, it lapsed because the intended beneficiaries under California law died before the law went into effect. For all of these reasons, we ask for your support. Affirm the decision below, and we thank you all. I'll give you a few minutes for rebuttal since you let Mr. Sonny go over. Five minutes. I assume you have something you want to say. Hmm. Good morning again, Your Honors. First of all, as to the issue on the Indiana right of publicity statute, it's not CMG's position that there is retroactive application, as I alluded to earlier. The position of CMG is that this is a right that's always existed. It was merely codified in 1994. I think what is confusing, or may be confusing, and what may have been confusing to Judge Morrow is that there's this 100-year look-back provision. That look-back provision does not assign retroactive application to these, or create a right, nor does it assign retroactive application to the law that was created in 1994. As we've argued in our brief, I think it's fairly well set forth. The Lanham Act was passed in 19, I believe in 1947. The Lanham Act, there's nothing in the Lanham Act that would preclude application of that statute, which is an extension of trademark rights, to deceased celebrities, or deceased personalities, as it's defined under Indiana law. Additionally, there was this notion of the Federal Omnibus Crime Act that was passed in 1948 that made it a crime for there to be a slander or libel of a person or a personality who was deceased. So these concepts did exist in the law. They weren't created in 1994 by the Indiana statute. By no means is that the case. It merely codified what was existing law. That's the argument that we make. Secondly, we don't believe that there's a... Did it survive? Did that common law right that you're talking about survive the death of the personality? I'm sorry, the common law right that you're talking about right now survive the death? Yes. Yes, we believe that it does, essentially. Why then did it take... Why then did it have to be statutorily modified to say that it survived the death if it already survived the death? Well, I don't think that the Indiana statute... I think the Indiana statute has plain meaning on its face, first of all. Second of all, I don't believe that the Indiana statute states that it's creating a right, necessarily. I think what it says is that it codifies a cause of action that always existed under Indiana law. And I think, speaking to Mr. Sony's contentions, I don't believe that there are choice of law issues here. I think Indiana is free to legislate what happens within its own borders and what interests its citizens may have. This case, or the Indiana statute, does not discriminate against out-of-state citizens. It talks about activities that take place within Indiana's borders. I think they're perfectly free to legislate that. I think that the interests of Indiana's citizens are served by that legislation in ensuring that there's no counterfeit products that are out there that its citizens buy. I think there are a number of other interests that are served by that legislation for the citizens of Indiana. Thank you. Just very briefly, on the issue of representation, there's no question that Aaron Frosh acted in a representative capacity for the estate. The real question is whether he acted in a constitutionally adequate capacity on behalf of the estate. And given the facts that are in dispute in this case, at a minimum, that's a question of fact that should not have been resolved on summary judgment. Additionally, the fact that there are inconsistencies, and we've talked about those today, whether or not there is an adequate explanation for those inconsistencies is also something that is a question of fact that should go to a jury to the extent a third-party judicial estoppel theory is going to be recognized by this Court. And I would cite the Court to the Cleveland decision in which the Court found that discrepancies as to two statements taken in an SSI proceeding and an ADA proceeding where there was an adequate explanation, that is an issue that should go to the jury. Finally, on the Fifth and Ninth Circuits case law requiring a deliberately false statement of fraud on the Court, if you will, survives New Hampshire v. Maine, New Hampshire specifically said here are three considerations for judicial estoppel, but there are other factors that could inform the analysis as to whether this very significant sanction should be imposed. And so do not believe there's anything in New Hampshire v. Maine that would preclude a Court from the Ninth Circuit in particular from imposing an intent requirement. And given the fundamental nature of judicial estoppel as being a remedy for self-contradiction, it's a wholly appropriate consideration for the Court. And one that in this case, again, to the extent that the theory of estoppel is going to be recognized is a question of fact that should go to a jury. And I would cite the Court to the John S. Clark Fourth Circuit decision in our brief on that issue. As to the constitutional issue with respect to the California legislation, that's not a ripe issue unless and until a jury decides that Marilyn Monroe was a California domiciliary. And we would submit that our client has a right to reach a jury on that question. It has never had an opportunity to be heard as to whether Marilyn Monroe intended to die a domiciliary, sorry, intended to remain in California at the time she died. No adjudication has ever been made as to whether she was a California domiciliary to which my client had notice and an opportunity to be heard. Thank you. So essentially you're talking about three separate factual areas of factual dispute, privity, the existence of the location of the domicile as well as the existence of intentional misrepresentation. All of those, what you're suggesting is, require factual development. I'm suggesting that whether privity existed as a matter of fact in this case is a question of fact that should not have been resolved on summary judgment. That whether Marilyn Monroe LLC proffered a sufficient explanation to explain the disparity or the discrepancy between the two positions of it and Mr. Frosch is also a question of fact. And that the issue of intent is inherently a question of fact. And you pointed out whose intent do we look at? Well, because we don't recognize third-party judicial estoppel, it's an issue that's never come up. I don't know the answer as to whose intent. I would argue that it's the party to be estopped because that's the person suffering a draconian remedy, in this case effectively terminating sanctions. And I would argue that if you're going to take away somebody's jury right, that the intent to mislead ought to be the estopped party. That's an inherently factual question that should be answered, if at all, by a jury. Thank you, counsel. This session of the Court will be adjourned for today. ... ... ... ... ... ... ...
judges: Sessions, Goodwin, Wardlaw